**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

CHRISTOPHER R. WINDISH      :
     :
       v.               :       **CIVIL ACTION NO. 20-5942**
     :
BUCKINGHAM TOWNSHIP       :

---

**MCHUGH, J.**                                                 **February 2, 2023**

### MEMORANDUM

This is a discrimination action under the Americans with Disabilities Act ("ADA") brought by a former Patrol Officer at the Buckingham Township Police Department. During Plaintiff's time as a Patrol Officer, he suffered from plaque psoriasis and required a vest carrier[1] that differed from typical Department uniform in order to minimize psoriasis flare-ups. He took issue with his Chief's views of how to accommodate his needs, but ultimately he and the Department were able to settle on a vest carrier that Plaintiff found acceptable. Separately, Plaintiff violated Department rules and policies on several occasions and his performance began to drop precipitously. After an incident in which Plaintiff was found searching through the Department's Drug-Take-Back box, the Department initiated an investigation that revealed multiple problems with Plaintiff's performance, which resulted in his termination. Plaintiff now contends that he was fired in retaliation for seeking an accommodation for his psoriasis, and not because of his performance. As a matter of first impression, the core premise of Plaintiff's case lacks resonance, because the misconduct set forth in his letter of termination is so extensive that it seems highly improbable a personal grudge over a small accommodation motivated his firing. A review of the record confirms

---

[1] In common parlance a "vest carrier" is often referred to as a "bulletproof vest."

this impression, as there is ample support for the Township's position and scant evidence of discrimination or retaliation.  I will therefore grant the Township's pending motion for summary judgment.

## I.     Relevant Background

### A.  Windish's Psoriasis and Requests to Wear an Outside Vest Carrier

Plaintiff Christopher Windish was employed as a Patrol Officer at the Buckingham Township Police Department from roughly January 1997 to January 2020, when his employment was terminated after a disciplinary investigation found that he had engaged in serial misconduct. Windish Dep. at 67:1-2, ECF 43; Def.'s Ex. Y, ECF 30-6 at 17.  During his time as a Patrol Officer, Windish suffered from psoriasis-induced flare-ups that required the use of a vest carrier different than that used by the other Patrol Officers in the Department.  *See* Pl.'s Ex. 2, ECF 38-3 at 2.

Windish was first diagnosed with plaque psoriasis around 1996.  Windish Dep. at 201:7-11.  According to Windish, he experiences psoriasis-induced flare-ups that are characterized by patches on his arms, legs, scalp, and primarily his back and chest.  *Id*. at 206:5-10.  These flare-ups were oftentimes caused by sweating.  *Id*. at 206:16-19.  When caused by sweating, the patches were typically bright red and form together into a rash that later turns scaly.  *Id*. at 209:15-22. When not caused by sweating, the patches were typically dry and scaly.  *Id*.  Windish has stated that the flare-ups typically went away in a week or two.  *Id*. at 210:10-11.  During a flare-up, Windish experienced symptoms of itchiness and pain, with the bright red patches being very painful or uncomfortable.  *Id*. at 212:9-23.  When asked how a typical flare-up rates on a traditional

medical pain scale of one to ten, Windish stated that the red patches were a three or a four, depending on the degree to which his clothing was rubbing the patches. *Id.* at 213:3-9.[2]

Windish notified the Police Department of his psoriasis in early 2000. Windish Dep. at 213:16-19. Around 2004 or 2005, Windish asked to wear an outside vest carrier to accommodate for the fact that a vest worn under his shirt would more severely impact his psoriasis. *Id.* at 218:2-219:10. The Chief at the time allowed Windish to wear his desired vest carrier on the outside of his uniform. *Id.* at 219:11-16.

Michael Gallagher became Chief in January 2017, around which time Windish notified Gallagher of his psoriasis diagnosis. Def.'s Ex. G at 590:21-591:2, ECF 30-4 at 17; Windish Dep. at 118:2-9. At the time, Gallagher did not have an issue with Windish wearing an outside vest carrier, except for the fact that he did not like the color of Windish's vest carrier, because it was black rather than the required "LAPD Blue." Windish Dep. at 118:2-9, 114:22-115:5, 221:5-24.

Chief Gallagher instituted a new mandatory uniform policy in May 2017 in the interest of promoting uniformity among the Department. Def.'s Ex. H, ECF 30-4 at 20; Def.'s Ex. I, Gallagher Dep. at 13-15, ECF 30-4 at 32-34. The policy provided that uniformed members could wear an outside vest carrier when on night shift as long as the carrier had an embroidered badge and name plate. Def.'s Ex. H at 5-6; Gallagher Dep. at 13-15. The decision to allow outside vest carriers during night shifts was made to accommodate Windish, who frequently worked such hours. Gallagher Dep. at 13-15.

---

[2] A 2017 dermatologist record characterized Windish's psoriasis as "located on the body throughout and . . . mild in severity." Def.'s Ex. F, ECF 30-4 at 4. A February 2018 letter from Windish's dermatologist to the Police Department characterized Windish's psoriasis as "severe." Pl.'s Ex. 2. An April 2018 dermatologist record characterized the psoriasis as "located on the left arm and . . . moderate in severity." Def.'s Ex. F, ECF 30-4 at 6. An August 2018 dermatologist record characterized it as "located on the left arm and . . . mild in severity." *Id.* at 7. Finally, a June 2019 dermatologist record characterized it as "located on the body throughout and . . . mild in severity." *Id.* at 9.

During the summer of 2017, the Department informed Windish that they would order a new outside vest carrier for him to wear because the vest he had been wearing violated the new uniform policy.  Windish Dep. at 224:24-225:10.  This caused a dispute, with Windish desiring to continue wearing the same vest carrier he had previously worn.  *Id.* at 225:11-227:24.  Windish claimed that the new carrier would create psoriasis flare-ups.  *Id.* at 228:1-23.  Over the next six months, the Department proceeded to order six different outside vest carriers for Windish to try, all of which Windish claimed would continue to aggravate his psoriasis.  *Id.* at 228:8-232:10.  Windish primarily continued to wear his old carrier during this time, and testified that he experienced several flare-ups when wearing the Department's procured vests.  *Id*.

At one point during this period, Windish was sent home to cure his failure to be in uniform by ironing on the necessary embroidery to his vest carrier.  *Id.* at 233:16-235:11.  Windish was able to quickly fix this issue and did not lose pay.  *Id.*  Gallagher also took away one of Windish's "special assignments" during this period, but the record does not show that this was related to Windish's failure to be in uniform, and it did not affect Windish's compensation.  *Id.* at 285:11-287:5, 246:19-249:12.  Finally, Gallagher made a sarcastic remark during this period, stating that Windish should ask for accommodations so that he didn't have to wear a necktie.  *Id.* at 241:20-244:18.

Also in 2017, Gallagher asked Windish to provide a doctor's note explaining what sort of vest carrier would best accommodate Windish's psoriasis.  Gallagher Dep. at 25:1-26:24.  Gallagher rejected the first letter he received, contending that it did not provide sufficient information on how to accommodate Windish's needs, and Gallagher requested a second note, which Gallagher also felt was insufficiently specific.  *Id.*

In late 2017 or early 2018, Windish acquired his desired outside vest carrier in LAPD Blue and attached the required embroidery to it.  Windish Dep. at 238:17-241:19.  Windish did not receive any negative comments about his vest afterwards.  *Id.*

### B.  Windish's Misconduct and Disciplinary History

Windish was considered a model patrol officer during the early part of his career, Def.'s Ex. J, ECF 30-4 at 40, but beginning in 2011 and accelerating in 2018 and 2019, his employment at the Township Police Department was characterized by serial misconduct and corresponding disciplinary action.  This conduct ranged from minor infractions to major infractions that would independently support termination of his employment.

In February 2011, Windish was suspended for two days without pay for violating the Department's disciplinary code by failing to check and change his vehicle's oil resulting in damage to his vehicle's engine.  Def.'s Ex. J.[3]  Windish's Performance Evaluation Report for 2014 generally approved of Windish's performance but noted that "2014 presented many challenges to Chris that effected his self-initiated numbers.  Moving forward, Chris will need to manage outside stress while still working effectively as a permanent night worker."  Def.'s Ex. K, ECF 30-4 at 43-46.

In April 2018, Windish was charged with "failure to conduct proper investigation" after neglecting to notify police radio of a traffic accident he was involved in while on duty and failing to have the accident investigated by an outside agency as required by the Buckingham Township Police Department Operations Manual.  Def.'s Ex. L, ECF 30-4 at 48-49.  Windish received a written reprimand for the violation.  *Id.*

---

[3] This February 2011 notice of discipline included the following as a mitigating factor: "After reviewing your disciplinary record I find that you have never had any kind of discipline in your entire career.  I also note that you are in my opinion a model Police Officer who completes his work on time, generates a great amount of work and is well respected in both the Community and the Police Department."  *Id.*

In July 2018, Windish was counseled by Lieutenant Landis and Corporals McLeod and Foltz for lack of time management skills, propensity to arrive late, and lack of effort in all aspects of his job performance; Windish was notified that his activity would be monitored going forward. Def.'s Ex. N, ECF 30-4 at 66-67.

In November 2018, Windish received a supervisory note from Corporal Moffett for failure to respond to a fellow officer's request for backup in an active investigation. Def.'s Ex. O, ECF 30-4 at 69. In January 2019, Windish received a two-day suspension for failing to submit marijuana that he had seized as evidence. Def.'s Ex. G at 537-38; Def.'s Ex. C at 25. In June 2019, Windish received a written reprimand for "failure to properly care for assigned equipment" as a result of discharging his taser outside of established protocols. Def.'s Ex. P, ECF 30-4 at 71-72. Also in June 2019, Corporal Thomas wrote Windish a Supervisory Note for the incident with the taser and for "nod[ding] off" throughout the workday on several occasions. Def.'s Ex. Q, ECF 30-4 at 74.

Beginning in August 2019, Windish's infractions became more serious in nature. As documented in a September 12, 2019 letter from Lieutenant Landis to Chief Gallagher, Detective Corporal Bailey observed Windish crouching down next to an unlocked Drug-Take-Back box on August 13, 2019, while Windish was off duty. Def.'s Ex. S, ECF 30-4 at 79-80. Bailey then entered his office to retrieve the Drug-Take-Back box key and found that the safe containing the key was unlocked and the key was missing. *Id.* Windish claimed that he had mistakenly deposited his wife's medications in the box and was trying to retrieve them, but a later inventory of the box's contents found no medications prescribed to Windish's wife. *Id.* Corporal Stephen Thomas then reviewed the Police Department's video records and found that the Department's lobby camera

6

went out shortly after Windish had entered the building.  *Id.*  This incident caused the Department to initiate an investigation of Windish.  *See* Def.'s Ex. S; Def.'s Ex. M, Def.'s Ex. T.

As part of an administrative investigation following this incident, Windish was ordered to provide in writing a list of medications he had deposited in the box over the previous five years; a list of all attending physicians, hospitals, and care providers that had treated him over the previous five years; and a list of all medications he had been prescribed over the previous five years.  Def.'s Ex. U, ECF 30-5 at 20-22.  The Department found that Windish then "consciously and intentionally concealed two neurologists from this list."  *Id.* at 21.  The Department concluded that Windish concealed these neurologists for the purpose of concealing his history of seizures and resulting medical prohibitions.  *Id.*  These prohibitions included having his driver's license suspended, which he had concealed from the Department in order to continue to drive a Township police vehicle.  *Id.* at 21-22.  During an interview connected with the investigation, Windish also admitted to having had "drug or alcohol problems," including taking more medication than prescribed and mixing the medication with alcohol.  Def.'s Ex. T at 20-22.[4]

In a separate 2019 incident, Windish hid the fact that he had damaged his patrol car in contravention of Department rules and regulations.[5]  Def.'s Ex. C at 32-34.  In order to cover up the damage to his vehicle, Windish took a spare tire from another officer's vehicle without informing the officer.  *Id.*  Windish also admitted in 2019 to lying to a court about the availability of a witness in order to get a continuance of a hearing, when in fact Windish had failed to notify the witness of the hearing.  Def.'s Ex. T at 56-59.

---

[4] Deposition testimony and a drug test later revealed that Windish had taken Tramadol and Vicodin or Percocet without a medical prescription.  Def.'s Ex. X; Def.'s Ex. C at 69, 73; Def's Ex. U, ECF 30-5 at 22.

[5] Windish admitted to doing so on previous occasions, as well.  *Id.*

On January 22, 2020, Chief Gallagher submitted to the Buckingham Township Board of Supervisors his "Disciplinary Investigation Report and Request for Board to Adopt [His] Termination Recommendation of Officer Christopher Windish Due to Serial Misconduct and Violation of Law." Def.'s Ex. M. The Buckingham Township Board of Supervisors adopted Gallagher's recommendation and formally terminated Windish on the same day. Def.'s Ex. Y. Because of its relevance to Windish's claims and the Township's arguments on summary judgment, the Township's termination letter—signed by the Chairman of the Township Board of Supervisors—is reproduced here in its entirety:

Dear Officer Windish:

The Buckingham Township Board of Supervisors terminates your employment effective immediately based upon this Board's acceptance and adoption of Chief Gallagher's attached disciplinary memo finding multiple discipline violations and recommending termination. The Board's termination decision is based upon a full review of the Chief's disciplinary investigation memo and evidence including your multiple investigative interviews and all exhibits attached to your January 10, 2020 disciplinary interview.

The Board's termination decision is a progressive discipline termination decision based upon overwhelming evidence of serial misconduct including mishandling of marijuana evidence and failure to submit proper reports; serial and continuous lies by you to all police command staff including during your multiple investigative interviews; theft of drugs from the Township's drug disposal box; tampering with and disabling the Department's surveillance cameras; theft of department tires and damage to your police vehicle and tires which you failed to report and covered up; disobeying the Chief's orders and directives and providing intentionally incomplete lists of medical providers and prescribed drugs; insubordination in failure to appear for a polygraph test you had agreed to take and failure to ever provide a letter you claimed was coming from your attorney; lying to and providing false and incomplete histories to your doctors so as to cover up your abuse of narcotic prescribed and non-prescribed medicines and to restore your driving privileges; giving Chief Gallagher a false history as to the cause of your first seizure; failure to even advise the Chief of your second seizure, the suspension of your license and the medical prohibition banning you from driving; your driving fifteen twelve hour patrol shifts while you were medically prohibited from driving and your license

was suspended; violating the law continuously for fifteen days while you drove a patrol vehicle and responded to calls while you knew your license was suspended and you were medically prohibited from driving; your abuse of narcotic drugs and positive drug test which you falsely attributed to a twenty pill 2016 hydrocodone prescription which could not have been left over in 2018 due to your admitted abuse of pills; your admitted abuse of tramadol when the state prescription database and your doctors' records show that you were never prescribed tramadol[;] your lying to the Court regarding continuing a case when you had failed to do your duty and contact the witness regarding the scheduled hearing; serial lying, evasions, and consciously providing incomplete information to obstruct the chief's investigation and overall lack of remorse for your serial and egregious misconduct.

This Board adopts the Chief's disciplinary charges as founded and wants to clarify that all of these charges are serial founded charges involving multiple offenses due to your serial continuing egregious misconduct.

As point of clarification on your serial misconduct charges your conduct unbecoming charges under the Buckingham Police Department's Code of Discipline and under the Police Tenure Act are multiple counts in excess of forty due to your driving fifteen days without a valid license, serial lies during this investigation, theft of tires and concealment of damage to police vehicles and failure to report this damages, conscious disobedience of orders and intentionally omitting medical providers and prescriptions from requested lists, failure to report to this department your seizures, driving restrictions and positive drug test; entering the drug disposal box without permission, disabling the lobby surveillance cameras, taking drugs from the disposal box, etc. . . .

This Board also fully agrees with the Chief that while the cumulative overwhelming evidence of your serial misconduct calls for your firing[,] many of your disciplinary offenses stand alone in calling for your firing.  For example, your hiding your second seizure from the Police Department and hiding our medical prohibition against driving and your license suspension and then your driving a patrol vehicle for one twelve hour shift and putting yourself, the public and fellow officers in danger for this shift calls for your firing.  You doing this for fifteen patrol shifts and violating the very laws you are sworn to uphold for fifteen patrol shifts provides fourteen additional reasons for your termination.

Your serial insubordination in lying throughout this investigation countless times, consciously omitting doctors from a list you were ordered to provide and never telling this Department of your license suspension[,] your two seizures[,] or the true cause of your seizures and your medical driving restrictions calls for your termination.

Your unauthorized entry into the drug disposal box, theft of drugs and disabling the video cameras calls for your termination.

Your theft of tires, cover-up of damages to police vehicle and tires and failure to report such damage calls for your termination.

The Board in its termination of your employment fully adopts all of the charges, factual findings and the termination recommendation of the Chief listed in the Chief's attached memo. The Board notes that your serial violation of Pennsylvania Law, the Buckingham Township Police Department's Rules and Regulations and the Police Tenure Act call for termination. The Board further notes the egregious and cumulative nature of your misconduct has rendered you unfit to serve as a Buckingham Township Police Officer. You have brought great disrepute upon this Department and the overwhelming evidence of your serial misconduct calls for your termination.

Def.'s Ex. Y.

Following the Township's termination of Windish, the Buckingham Township Police Benevolent Association ["PBA"] processed a grievance on behalf of Windish pursuant to the PBA and Township's collective bargaining agreement. Pl.'s Ex. 17 at 1-2, ECF 38-18. The PBA claimed that the Township violated the collective bargaining agreement when firing Windish. *Id.* The Township denied the grievance, and the matter went to arbitration before the American Arbitration Association. *Id.* Because Windish references the outcome in his Response to the Township's Motion for Summary Judgment, I will summarize the arbitrator's award here, even though I do not deem it controlling.[6] The arbitrator concluded that the Township's discharge of Windish was proper because of Windish's conscious decision to drive his patrol shifts while his license was suspended and his failure to advise his superiors of his medical condition. *Id.* at 38-40. The arbitrator also found that the Township had not presented clear and convincing evidence

---

[6] In resolving this motion, I do not consider the arbitration award as having preclusive effect, because the issues there were framed differently, and a different standard, "clear and convincing evidence," governed that proceeding. I will however address the award to the extent the parties refer to it, and where it bears upon whether there is a disputed issue of fact.

to justify termination on any other grounds and criticized the Township's investigation for certain procedural deficiencies.  *Id.* at 39-40.

## II.  Standard of Review

This Motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as described by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.  Discussion

Windish claims that he was discriminated and retaliated against in violation of the ADA. An "employer can unlawfully 'discriminate' within the meaning of the ADA . . . if the employer takes adverse action against a qualified individual with a disability and that decision was motivated by the individual's actual disability . . . . (i.e. disparate treatment)."  *Isley v. Aker Philadelphia Shipyard*, 275 F. Supp. 3d 620, 626 (E.D. Pa. 2017) (citing *Fuoco v. Lehigh Univ.*, 981 F. Supp. 2d 352, 361 (E.D. Pa. 2013)).[7]  The ADA also prohibits retaliation against individuals for opposing acts or practices made unlawful by the ADA.  42 U.S.C. § 12203.

Courts assess both "disparate treatment" discrimination claims and retaliation claims under the well-known *McDonnell Douglas* burden-shifting framework.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-806 (1973); *see Walton v. Mental Health Ass'n. of Se. Pa.*, 168 F.3d 661, 667-68 (3d Cir. 1999) (citing *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 68-69 & n.7 (3d Cir. 1996)) ("The *McDonnell Douglas* Title VII burden shifting rules apply to claims of discriminatory treatment under the ADA."); *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (3d Cir. 2003) ("A 'pretext' claim of illegal retaliation follows the familiar burden

---

[7] An employer can also unlawfully discriminate under the ADA if "the employer fails to make reasonable accommodations for that individual [employee]," but Windish does not appear to be alleging a failure to accommodate claim.  *Id.*

shifting analysis . . . set forth in *McDonnell Douglas*."). Under that framework, a plaintiff bears the initial burden of establishing a *prima facie* discrimination or retaliation claim; the burden then shifts to the defendant to show a legitimate non-discriminatory or non-retaliatory reason for the adverse employment action at issue; and the burden finally shifts back to the plaintiff to show that the non-discriminatory or non-retaliatory reason is a pretext for unlawful discrimination or retaliation. *See Walton*, 168 F.3d at 668-69.

The standards for establishing a *prima facie* claim for discrimination and retaliation differ.[8] The Township argues that Windish has not introduced sufficient evidence to establish either a *prima facie* discrimination or retaliation claim. But it is not necessary to decide whether Windish has in fact established *prima facie* claims, because it is clear that the Township had multiple non-discriminatory and non-retaliatory reasons for terminating Windish's employment, and Windish has failed to introduce evidence showing that those reasons were pretext for discrimination or retaliation. Summary judgment in favor of the Township is therefore appropriate.

### A. Buckingham Township Had Numerous, Well-Documented Reasons for Terminating Windish's Employment

Assuming without deciding that Windish carried his burden to establish *prima facie* claims for his termination being discriminatory and/or retaliatory, I must determine whether the Township has "introduce[d] evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,

---

[8] *Compare Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) ("[I]n order for a plaintiff to establish a prima facie case of discrimination under the ADA, the plaintiff must show: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.") (internal quotations omitted), *with Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997) ("To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.") (citations omitted).

509 (1993); *see also Shellenberger*, 318 F.3d at 189 (applying this standard to an ADA retaliation claim).  In this case, it undoubtedly has done so.

The Township's termination letter, which followed an internal administrative investigation of Windish's actions, exhaustively documents a wide range of misconduct.  Def.'s Ex. Y.  Some of this conduct, such as driving patrol shifts with a license revoked on medical grounds, could independently justify termination, whereas other conduct only rises in significance due to its cumulative weight and role in the Township's progressive discipline process.  *Id.*  Because the Township's evidence must be taken as true when determining whether the Township has met its burden under *McDonnell Douglas*, the Township's termination letter and the evidence supporting each charge easily suffice to satisfy the Township's burden.  *Id.*; *see also* Def.'s Exs. J-U.

### B. Windish Has Failed to Introduce Evidence Showing that Buckingham Township's Reasons for Terminating Him Were Pretext

Because the Township has articulated legitimate, non-discriminatory and non-retaliatory reasons for terminating Windish's employment, Windish must point to evidence that "the legitimate reasons offered by the [Township] were not its true reasons, but were a pretext for discrimination [or retaliation]."  *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981); *see also Shellenberger*, 318 F.3d at 190 (applying this standard to an ADA retaliation claim). Windish could meet this burden by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  He has failed to do so.[9]

---

[9] Many of the factual assertions in Windish's Response merely cite back to his Complaint.  Because factual averments in pleadings are insufficient to defeat a motion for summary judgment, my analysis focuses on

Windish argues that, but for the retaliatory animus of Chief Gallagher, Windish would still be employed at the Township.  His arguments are not convincing.  At best, the evidence Windish offers shows that Gallagher was reticent to believe Windish's need for an accommodation in 2017 and early 2018, but that the Department nonetheless worked to accommodate his needs.  No evidence connects any personal reticence on Gallagher's part with the decision to terminate Windish's employment in 2020.

Windish first argues that Gallagher's credibility is at issue because he refused to accept the idea that wearing the wrong vest caused Plaintiff's psoriasis flare-ups.  Specifically, Windish contends that at deposition Gallagher refused to admit that Windish "had been accommodated since the year 2000 until shown the admission by Defendant in its answer to paragraph 19 of the complaint."  Pl.'s Resp. to Mot. for Summ. J. at 20, ECF 38.  But Windish plainly and brazenly mischaracterizes the record on this point.  When Gallagher's testimony is read in its entirety, it is clear that he did not dispute that an accommodation was granted as of 2000; he only disputed whether Gallagher personally was required to obtain and pay for his own vest.  Pl. Ex. 3, Gallagher Dep. at 21:11-24:25, ECF 38-4.

Windish suggests harassment by Gallagher because he requested two letters from Windish's doctor to verify Windish's disability. But Windish has not introduced evidence to

---

the assertions for which Windish has cited record evidence.  *See Celotex Corp.*, 477 U.S. at 324 ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred."); *Tomalewski v. State Farm Life Ins. Co.*, 494 F.2d 882, 884 (3d Cir. 1974) ("In reaching its determination the court has the power to penetrate the allegations of fact in the pleadings and look at any evidential source to determine whether there is an issue of fact to be tried. * * * The primary purpose of a motion for summary judgment is to avoid a useless trial, and summary judgment is a procedural device for promptly disposing of actions in which there is no genuine issue of any material fact even though such issue might have been raised by formal pleadings.").

counter Gallagher's explanations as to why these requests were appropriate and necessary.[10]   In

his deposition, Gallagher explained that his request was "[n]ot to confirm that he had the medical

condition," but instead "to see exactly what type of material annoys or bothers his condition."

Gallagher Dep. at 25-26.  Gallagher further stated that Windish's doctor's letters failed to provide

this information.  *Id.*  Relatedly, Plaintiff's counsel argues that "Gallagher wanted Plaintiff to strip

in order to see the psoriasis outbreak."  Pl.'s Resp. to Mot. for Summ. J. at 20.  This argument is

flatly contradicted by the record, as Windish admitted in his deposition that "Chief Gallagher never

asked [him] to take off [his] clothes so that he could see [his] psoriasis rash."[11]  Windish Dep. at

245:6-10.

In the same deposition, Windish testified that Gallagher had mocked Windish by saying

that he should ask for accommodations so that he would not have to wear a necktie.  *Id.* at 241:20-

244:18.  If so, such comment was inappropriate.  But because Windish has testified that no similar

comment was made after the vest issue was resolved in late 2017 or early 2018 and has not pointed

to a pattern of similar comments, *id.* at 241:11-19, this one comment by itself cannot support a

conclusion that the reasons for terminating Windish in 2020 were pretextual, especially

considering Windish's serious misconduct in the intervening period.  Finally, Windish argues that

Gallagher threatened Windish with losing his "special assignments" if he did not comply with

Gallagher's uniform requirements and thereafter did take away one assignment.  But the

Department's uniform requirements are a matter distinct from Windish's need for an

---

[10] Confusingly, Windish also states—without providing a record citation—that "Gallagher never requested such a letter."  Resp. to Mot. for Summ. J. at 20.

[11] Windish also points to his own testimony where he claims that Gallagher said on several occasions that he didn't understand what the problem was.  These comments do not bear on pretext given the Department's efforts to accommodate Windish, and the fact that Windish never suffered any disciplinary action because of his differing uniform.

accommodation, and the decision to take away the assignment did not affect Windish's compensation.  *Id.* at 285:11-287:5; 246:19-249:12.[12]

Windish attempts to attach significance to instructions given by Chief Gallagher to Lieutenant Landis on how to format memos summarizing investigations into officer conduct.  Pl.'s Ex. 12, ECF 38-13.  The memorandum itself is an unrelated 2009 supervisory note, with redactions, on which Gallagher wrote the following:

> JR,
> This is one of my investigations. Please put your supervisory note in this format. Charges from code 1st, history 2nd, Dish's issues 3rd, incident, and last recommendation.
> Thanks, MG

*Id.*  Windish argues that this note demonstrates that Chief Gallagher was planning Windish's termination before Windish had any discipline against him, going so far as to contend that the "recommendation" was "presumably to terminate employment."  Pl.'s Resp. to Mot. for Summ. J. at 21.  This line of argument carries little weight.  Landis was involved in the investigation of Windish, an investigation that there were grounds to commence.  There is nothing nefarious in Gallagher instructing Landis on the form of report he preferred.  And the premise of Windish's argument—that Gallagher had a predetermined outcome—is not supported by the memo, because Gallagher requested Landis to convey a recommendation, a request that would have been irrelevant if Gallagher already had an outcome in mind.  Windish's characterization of the memo is wholly speculative, and as such it lacks evidentiary value for purposes of determining whether there is an issue of fact.  *See Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) ("[A]n

---

[12] According to Windish, Lieutenant Landis previously stated that "he would hate to see [Windish] lose [his] specialty jobs for not complying," *id.* at 246:19-22, but Landis' musing sheds no light on Gallagher's decision-making process.  In the same portion of his deposition, Windish acknowledged Gallagher communicating a different reason for taking away the special assignment: the Chief's desire to "take something off [Windish's] plate so that [he] could focus on bettering [his] performance." *Id.* at 248:16-23.

inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat an entry of summary judgment.").

Windish argues that one of the alleged bases for his termination—the allegation that he lied to a court by falsely claiming that his witness was unavailable in order to receive a continuance— is untrue, supporting the conclusion that his termination was pretextual.  In his briefing and an attached affidavit, ECF 38-16, Plaintiff identifies this as an issue that was not addressed by the arbitrator, and claims that Chief Gallagher knew that his allegation about  Windish lying to the court was false.  Preliminarily, I note that the arbitrator squarely rejected this contention:

> The Township also cited in the termination letter an allegation that Grievant lied to the Court to obtain a continuance.  During his September 17, 2019 interview Grievant admitted to the Chief that he lied to the Court about the availability of a witness in order to get a continuance of the hearing, while it was in fact the Grievant who had failed to notify the witness of the hearing.  This charge is sustained.

Pl.'s Ex. 17 at 37.  Putting aside the arbitration, my separate review of the September 17, 2019 Departmental interview between Windish and the Chief confirms that Windish did in fact admit to lying to the court about this very issue.  Def.'s Ex. T at 56-59, ECF 30-5 at 15-18.  Such a conflict between prior testimony and a later affidavit falls squarely within the "sham affidavit doctrine," which states that "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict."  *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004).  In the face of his prior admission, Windish's contradictory affidavit does not suffice to suggest that this alleged basis for his termination was pretextual.

Windish elsewhere argues that the treatment of an allegedly similarly situated officer, Mark Lewandowski, shows that Windish suffered disparate treatment.  The only record evidence of Lewandowski's treatment comes from an affidavit of Windish, which reads:

> Mark Lewandowski was a police officer with Buckingham Township. As indicated in the memorandum in opposition to summary judgment, he was allowed to resign. He was caught in a lie after being terminated for DUI and reinstated by the arbitrator. He got the opportunity to resign. That was not an opportunity given to me.

ECF 38-17. This affidavit does not show disparate treatment. A plaintiff can show pretext by presenting evidence that "the employer treated other, similarly situated persons not of his protected class more favorably." *Fuentes*, 32 F.3d at 765. Comparators must be "similarly situated in all respects," including by having "engaged in the same conduct." *In re Trib. Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)) (cleaned up). Windish has not introduced evidence showing that Lewandowski is an appropriate comparator, because he has not shown that Lewandowski's infractions "were of comparable seriousness to [Windish's] own infraction, and that [Lewandowski] engaged in the same conduct without such differentiating or mitigating circumstances as would distinguish [Lewandowski's] conduct or the employer's resulting treatment of [him]." *Tyler v. SEPTA*, No. Civ.A.99–4825, 2002 WL 31965896, at *3 (E.D. Pa. Nov. 8, 2002), *aff'd*, 85 F. App'x 875 (3rd Cir. 2003); *see also McDonnell Douglas Corp.*, 411 U.S. at 804 ("Especially relevant to such a showing would be evidence that white employees involved in acts against petitioner *of comparable seriousness* to the 'stall-in' were nevertheless retained or rehired.") (emphasis added). Windish was charged with far more than a single instance of lying during an investigation, and the reasons set forth in his letter of termination covered a broad range of conduct. Lewandowski can hardly be deemed an appropriate comparator.

The closest that Windish comes to introducing evidence that might suggest a discriminatory or retaliatory basis for his termination is testimony from Officer Macmoran, which Windish characterizes as affirming "that Plaintiff was singled out for discipline." Pl.'s Resp. to

Mot. for Summ. J. at 21.  But Officer Macmoran's testimony is simply too speculative to defeat summary judgment.  The Third Circuit has explained that "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat an entry of summary judgment."  *Robertson*, 914 F.2d at 382 n.12.  A close inspection of the submitted testimony of Officer Macmoran reveals that the testimony falls squarely within this definition.  The testimony reads, in relevant part:

> Q. With these anomalies that you've testified to, are they some of the reasons why you believe that Chris was being singled out?
>
> A. Just little stuff that you would notice.  Like I said, it was, you know, you started out with the vest issue.  Then, something else would come up or Chris did this or that.  It was, like, it just seemed like there were too many little things, I don't want to say, picked on, but it almost seemed that way.
>
> One of these things that I found is one person is the focus and then when that person, somebody else does something, then they become the focus and that person gets a little bit of a break.  Then, it goes back. It always seems someone has to be the focus.
>
> Q. It's your testimony that you don't know why he's the focus, or do you have any idea as to why he was?
>
> A. My opinion is because he wasn't conforming to what the chief wanted.
>
> Q. That was in respect of the dress code?
>
> A. I believe so.  I believe that's a big part of it.  The chief wants to be right all the time and wants people to tell him he's right all the time.  I think that that, it may have nothing to do with it.  I don't know, but it was just the feeling I get is because he wasn't conforming with that, that the focus was put on him.

MacMoran Dep. at 36:17-37:20, Def.'s Ex. CC, ECF 41-2.  This testimony is so couched in the witness' impressions, further limited by various qualifications, that its evidentiary value is minimal.  Macmoran states that it *almost seemed* that Windish was picked on; that *it was just the feeling* he got that noncompliance with dress code was the reason; but that *it may have nothing to*

*do with it*.  Such speculative testimony does not create a material factual dispute sufficient to defeat an entry of summary judgment under *Robertson*.

Finally, Windish argues that the arbitrator found evidence of pretext that I should consider at my discretion.   As a preliminary matter, when the parties were directed to address the significance of the arbitration, ECF 23, Windish argued that "the Arbitrator's decision pertaining to plaintiff's dismissal by the Township has no relevance to this case," because "[t]he Arbitrator's strict mandate was only to determine if Buckingham Township had violated its collective bargaining agreement with the Buckingham Township Police Benevolent Association to the detriment of Christopher Windish." Memo. of Law in Respect of the Relevance of the Arbitrator's Decision to this Case, ECF 24.   He now reverses course and asks me to deem the arbitration relevant.  But I do not see significant relevance at this point.   At the arbitration hearing, the issue was whether the Township had just cause to terminate Windish's employment, and the Township bore the burden to "present clear and convincing evidence that [Windish] engaged in the kind of misconduct that justified his being discharged" under the terms of a collective bargaining agreement. Pl.'s Ex. 17 at 30.   Both the issue and the controlling standard were different.   Under Rule 56, Windish must point to the evidence suggesting his termination was discriminatory or retaliatory under the terms of a federal statute.   And for purposes of the pending motion, "the critical inquiry . . . is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty justifying discharge." *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 153 (3d Cir. 2017) (quoting *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002 (8th Cir. 2012)).   Given these important distinctions, the arbitrator's findings do not directly bear on my analysis.

Even if I were to defer to those findings, they would not forestall summary judgment.  The arbitrator found that the Township failed to prove many of the charges lodged against Windish, under the heightened standard imposed  by the contract, but nonetheless found that the Township *did* prove that Windish made a conscious decision to drive his patrol shifts while being aware that his license was suspended—"a clear violation of Article V, Section 5.34 of the Department's Disciplinary Code."  Pl.'s Ex. 17 at 38.  The arbitrator specifically found that Windish's "actions were reckless and placed himself, the public and the Township in danger," and concluded that "[t]he severity of this violation warrants discharge."  *Id.* at 38-39.  In addressing the Township's other grounds for termination, the arbitrator did not make any finding that the grounds were pretextual or that the Township lacked an honest belief that there were legitimate grounds for termination; rather, the arbitrator found that the Township failed to provide "clear and convincing" evidence to support the charges—a far different legal standard than the standard for Windish's ADA claims.  *Id.* at 30-40.

No reasonable jury could find that the reasons for Windish's termination were pretextual.

## IV.    Conclusion

Because Windish has failed to introduce evidence sufficient for a jury to find  that the Township's grounds for terminating him were a pretext for discrimination or retaliation, summary judgment is appropriate as to both claims.

/s/ Gerald Austin McHugh
United States District Judge